## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

Solomon Friedman on behalf of himself and all
others similarly situated,

     Plaintiffs,

    *against*

AMERICAN AIRLINES GROUP, INC.,
AMERICAN AIRLINES, INC.  DELTA AIR
LINES, INC., SOUTHWEST AIRLINES CO.,
UNITED CONTINENTAL HOLDINGS, INC.,
and UNITED AIRLINES, INC.

     Defendants.

---

**CLASS ACTION COMPLAINT**
<u>JURY TRIAL DEMANDED</u>

  Plaintiff Solomon Friedman by and through his undersigned attorneys, individually and on

behalf of himself and all others similarly situated, bring this action for damages and injunctive

relief under Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. §1, and the antitrust laws

of the United States against the defendants American Airlines Group, Inc., American Airlines,

Inc., Delta Air Lines, Inc., Southwest Airlines Co., United Continental Holdings, Inc., and United

Airlines, Inc. (collectively "Defendants") arising from a conspiracy to raise, fix, stabilize, or

maintain prices for domestic air passenger transportation services in the United States from July

1, 2011, through the present (the "Class Period").  Plaintiff, based upon the investigation of

counsel and upon information and belief, allege as follows:

## I.  INTRODUCTION

1.     This antitrust class action arises out of a conspiracy among the largest U.S. airlines, who collectively account for over 80% of all domestic air travel, to unlawfully restrain competition on key airline routes throughout the United States.

2.     From approximately, July 1, 2011 to the present (the "Class Period"), Defendants conspired to raise the price of domestic airfare in the United States, by various means including, but not limited to, restricting output by limiting passenger capacity, flights, and routes available within the United States.

3.     The U.S. Department of Justice ("DOJ") has initiated an investigation into anticompetitive practices in the domestic airline industry, including whether Defendants colluded to restrain capacity and drive up the price of domestic airfare.

4.     The domestic airline industry exhibits certain hallmark characteristics of antitrust conspiracies including: (a) a heavily concentrated market dominated by a few firms; (b) significant barriers to entry; (c) membership in trade associations that allow the defendants to exchange competitive information; and (d) pricing behavior that is inconsistent with a competitive market.

5.     As alleged herein, Defendants entered into an illegal agreement, combination, or conspiracy to raise and maintain the price of domestic airfare in the United States.  As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class paid higher prices for domestic air travel than they would have paid in a competitive market.

## II.  JURISDICTION AND VENUE

6.     Plaintiffs bring this action to obtain injunctive relief and treble damages, and reasonable attorneys' fees and costs, resulting  from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

7.     This Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.

8.     Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c), and (d), because at all times relevant to the Complaint, Defendants resided, transacted business, were found within, and/or had agents within this District, and a substantial part of the events giving rise to Plaintiff's claims occurred, and/or a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

9.     This Court has personal jurisdiction over Defendants because, inter alia, each: (a) transacted business in this District; (b) directly sold and delivered passenger air transportation in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy and agreement to limit capacity that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

### III.  PARTIES

**A.     Plaintiff**

10.     Plaintiff Solomon Friedman is an individual who resides in Brooklyn, NY.  During the Class Period, he purchased one or more tickets for domestic air travel directly from one or more Defendants and as a result, Plaintiff suffered antitrust injury as a result of the violations alleged in this Complaint.

**B.     Defendants**

11.     Defendant American Airlines Group Inc. is a holding company and the parent company of Defendant American Airlines, Inc.  Both American Airlines Group, Inc. and American Airlines, Inc. (collectively, "American") are Delaware corporations with their principal places of business located in Fort Worth, Texas.

12.    American was formed in December 2013 as a result of the merger of AMR Corporation, the previous parent company of American Airlines, and US Airways Group, the previous parent company of US Airways.  The new American is the largest airline in the world, operating nearly 6,700 flights per day to 339 locations in 54 countries.  During the Class Period, American, either directly or through a subsidiary, participated in the conspiracy alleged in this Complaint, including by restricting capacity and agreeing to fix domestic airfare at artificially inflated levels.

13.    Defendant Delta Air Lines, Inc. ("Delta") is a Delaware corporation with its principal place of business located in Atlanta, Georgia.  Delta operates more than 5,400 flights per day to 326 locations in 64 countries.  During the Class Period, Delta, either directly or through a subsidiary, participated in the conspiracy alleged in this Complaint, including by restricting capacity and agreeing to fix domestic airfare at artificially inflated levels.

14.    In October 2008, Delta merged with Northwest Airlines.  The merger created what was then the world's largest airline.

15.    Defendant Southwest Airlines Co. ("Southwest") is a Texas corporation with its principal place of business located in Dallas, Texas.  Southwest operates more than 3,600 flights per day to 94 locations in the United States and six additional countries.  During the Class Period, Southwest, either directly or through a subsidiary, participated in the conspiracy alleged in this Complaint, including by restricting capacity and agreeing to fix domestic airfare at artificially inflated levels.

16.    In May 2011, Southwest acquired AirTran Airways through the acquisition of its parent company, AirTran Holdings, Inc.  The merger increased Southwest's passenger traffic by approximately 25% and briefly made it the largest airline in the U.S. by passenger capacity.

17.    Defendant United Continental Holdings, Inc. is a holding company and the parent company of Defendant United Airlines. Inc.  Both United Continental Holdings, Inc. and United

Airlines, Inc. (collectively, "United") are Delaware corporations with their principal places of business located in Chicago, Illinois.

18.     United offers service to more destinations than any other airline in the world, operating more than 5,300 flights per day to 369 locations across six continents.  During the Class Period, United, either directly or through a subsidiary, participated in the conspiracy alleged in this Complaint, including by restricting capacity and agreeing to fix domestic airfare at artificially inflated levels.

19.     In October 2010, United merged with Continental Airlines to form what was then the world's largest airline.  It has since been surpassed by the merged American Airlines.

## IV.  FACTUAL ALLEGATIONS

### A.     Background on the Airline Industry

20.     In 1978, Congress passed the Airline Deregulation Act ("ADA"), which completely deregulated the domestic airline industry.  The ADA removed government control over fares, routes, and market entry of new airlines, allowing market forces to dictate these and other facets of the industry.

21.     Since 1978, Defendants have been required to compete over fares, routes, and seats. In recent years, however, the airline industry has seen significant implicit and express coordination, which has led to higher fares, new and increased fees, and less options for American consumers.

22.     Airline consolidation has occurred in several waves from the 1920s onward. However, until the early 2000s, there still well over a dozen airlines with significant presences throughout all or much of the U.S., and most airports were serviced by numerous airlines.

23.     However, the greatest restriction on competition began in 2005 with the merger between US Airways and America West.  This was followed in 2008 with the merger of Delta and Northwest Airlines, in 2010, with the merger of United and Continental Airlines, in 2011, with the merger of Southwest and AirTran, and most recently, in 2013, with American and US Airways.

24.     Each of these mergers led to airlines that either became or were expected by analysts to become the world's largest airline.

25.     The US Airways-America West, Delta-Northwest, United-Continental and Southwest-AirTran mergers were all given regulatory approval.  However, each created concerns, voiced by the media and consumer groups, regarding lack of competition, increased fares, and reduced service.

26.     The Department of Justice initially opposed the merger between American and US Airways.  In August 2013, it filed an antitrust lawsuit against the two companies seeking to block the merger.  *See United States v. US Airways Group, Inc.*, No. 13-cv-01236 (D.D.C. 2013).  The DOJ's complaint painted a stark picture of an extremely consolidated market, dominated by five major airlines — American, Delta, Southwest, US Airways, and United — who wielded their enormous market power to increase fares while decreasing capacity.

27.     The complaint warned that the merger of American and US Airways "would make it easier for the remaining airlines to cooperate, rather than compete, on price and service."  DOJ Compl. ¶ 3. It noted that the "structure of the airline industry is already conductive to coordinated behavior:  Few large players dominate the industry; each transaction is small; and most pricing is readily transparent."  *Id.* ¶ 41.  It provided examples of such coordination, including competitors closely watching each other's pricing moves and frequently following price increases; using "cross-market initiatives," where a competitor, to deter discounting,  responds to an airline offering a discounted fair in one market with its own discount in another market in which the discounting airline prefers a higher fare; and direct communications between competitors designed to discourage or punish airlines who set off price wars.  *Id.* ¶¶ 42-45.

28.     Despite its initial opposition to the proposed merger, the DOJ eventually reached a settlement with American and US Airways that allowed the merger between the two airlines.  As part of the settlement, the airlines had to give up a number of gates and slots at major airports in Washington D.C., New York, Los Angeles, Chicago, Boston, Dallas, and Miami.

29.     The result of the merger between American and US Airways is that since 2005, nine major domestic airlines have now become four.  The remaining four major airlines — American, Delta, Southwest, and United — accounted for nearly 80% of the domestic airline market in 2014.

30.     Today, Defendants account for over 80% of the domestic airline market.  This increased consolidation has hurt airline passengers.  Defendants have, in tandem, raised fares, imposed new and higher fees on travelers, and reduced their capacity and service.  This has left American consumers with fewer choices in airline travel and caused them to pay hundreds of millions of dollars in increased airfare and ancillary fees for checked bags, flight changes, and similar services.

**B.     Defendants Agree to Exercise "Capacity Discipline," and Police the Conspiracy by Reaffirming in Public and Private That They Are Adhering to the Agreement**

31.     Defendants' primary mechanism in their efforts to collusively raise prices for airline consumers is their shared commitment to enforcing "capacity discipline."  As used by Defendants, "capacity discipline" is a euphemism for limiting the number of flights and total seats per route available to consumers. Defendants' coordination on offering only ever-higher fares for the artificially limited number of flights enabled Defendants to raise prices for domestic airline tickets to supracompetitive levels.

32.     Defendants' recently-discovered "capacity discipline" can be traced back to the industry's most recent wave of consolidation. As the DOJ noted in its August 2013 complaint against the American-US Airways merger, each significant legacy airline merger in recent years (the "legacy" airlines are American, Delta, and United) has been followed by substantial reductions in capacity.  According to the DOJ, "[t]hese capacity reductions have not consisted simply of cancellation of empty planes or empty seats; rather, when airlines have cut capacity after a merger, the number of passengers they carry on the affected routes has also decreased."

33.     The key to "capacity discipline," however, is that such discipline will not be able to create anticompetitive profits for an airline if that airline is the only competitor exercising such "discipline."  In other words, if a single airline reduces seat availability (that is, capacity) on a given route and raises prices as a result, then travelers will turn to other airlines with more capacity and lower prices on that route.  However, if all the airlines flying that route have agreed to reduce total seat availability for that route (in the form of fewer planes flying the route), then passengers have no option but to pay higher fares to fly that route.  For a large segment of the market, there is no convenient substitute for airline travel, so travelers have no option but to pay higher fares.

34.     For this reason, capacity discipline will only benefit an airline if it has reasonable assurance that it is either the exclusive (or near-exclusive) carrier for a given city-pair route[1] or, for city-pair routes with multiple carrier options, that its competitors will engage in the same "discipline."  It would be against an airline's independent self-interest for it to exercise "capacity discipline" unless its competitors also do so.  In Defendants' case, their shared commitment to capacity discipline was made feasible and rational by their knowledge that each had agreed to engage in the same capacity limitations.

35.     Defendants also signaled to each other that they remained committed to this agreement by publicly discussing their plans to continue exercising "capacity discipline."  For example, Jeff Smisek, the CEO of United, discussed United's $2 billion profits in 2014 and stated, "[w]e will absolutely not lose our capacity discipline . . . . It's very healthy for us and very healthy for the industry."

---

[1] "City-pair" refers to the two cities on either side of an airline route.  Thus, a flight between Washington, D.C. and New York is considered the "D.C.-New York city-pair."

36.     Similarly, in announcing Delta's 2014 fourth quarter results, Delta's chief executive, Richard Anderson, stated, "As we begin 2015, we have a significant opportunity from lower fuel prices, which will drive more than $2 billion in fuel savings over 2014.  Through our capacity discipline, pricing our product to demand, and the fuel savings, we expect to drive double-digit earnings growth, along with increased free cash flow and a higher return on invested capital in the upcoming year.

37.     In January 2015, Delta's Anderson (echoing the comments of United's Smisek cited above) stated: "We are not making any changes to our 2015 capacity plan in light of the lower fuel prices. . . . In fact, we continue to trim capacity on the margin to maintain yields."

38.     Prior to the American-US Airways merger, American had planned to expand domestically and internationally, adding additional flights and service on nearly 115 new routes. However, after the merger, the new American quashed that plan, choosing instead to toe the line with its competitors by exercising "capacity discipline."

39.     American's president, Scott Kirby, confirmed at an investment conference on March 3, 2015 that the company would not be adding capacity via additional airplanes: "Almost all of our capacity growth domestically is about putting more seats on airplanes." This type of capacity increase is *de minimis* and still permits the airline to charge higher rates because of the lack of additional flights.

40.     Indeed, as American's Kirby confirmed, each of the four Defendants were only interested in increasing capacity by way of cramming a relatively small number of additional seats onto airplanes: "All airlines for the most part are putting more seats on airplanes. We're doing it. United's doing it. Delta's doing it. Even Southwest is continuing to put more seats on their existing aircraft. Once you've done that, you're done."

41.     In the few instances where it appeared that a Defendant might break from the capacity limitation conspiracy, the response was swift and effective.  On May 20, 2015, Gary C. Kelly, the CEO of Southwest, announced a break from the industry stance on discipline, stating that Southwest planned to increase its capacity by as much as eight percent by acquiring two new gates at its hub at Love Field, Dallas.  The industry reaction was instantaneous.  The stock prices of the other Defendants plummeted.  Raymond James analyst Savanthi Syth wrote in response, in a research note: "understandably, investors are questioning if this signals the end of the era of industry capacity discipline."  Additionally, Wolfe Research airline analyst Hunter Keay stated: "Domestic capacity discipline has effectively vanished."

42.     As a result of this announcement, the other Defendants took action to ensure that Southwest did not destroy capacity discipline.

43.     The IATA's annual meeting took place on June 7-9, 2015 in Miami, Florida. Chief executives of many of the leading passenger airlines were in attendance.  During the course of that meeting, several of them spoke publicly about the need for "discipline" within the industry.  Delta's President, Ed Bastian, said that Delta is "continuing with the discipline that the marketplace is expecting."  American's chief executive, Douglas Parker, stated that the airlines had learned their lessons from past price wars, noting that "I think everybody in the industry understands that."

44.     On June 11, 2015, the New York Times published an article titled "'Discipline' for Airlines, Pain for Fliers," in which the author, James B. Stewart, commented: "Discipline is classic oligopoly-speak for limiting flights and seats, higher prices and fatter profit margins.  This year, that discipline seems to be working: the IATA projected this week that airline industry profits would more than double this year to nearly $30 billion, a record."  The New York Times also noted:

> When airline industry leaders say they're going to be disciplined, "they mean
> they don't want anyone to expand capacity," said Fiona Scott Morton, professor

of economics at Yale and a former deputy attorney general in the antitrust division of the Justice Department. "And when there aren't enough seats, airlines raise prices. That's what we've been seeing."

45.     The statements of the various airline executives and the pressure placed on Southwest at the IATA meeting had the desired effect. The New York Times article also noted, after coming under fire at this week's conference, Southwest quickly moved to reassure investors it isn't going rogue. 'We have taken steps this week to begin pulling down our second half 2014 to manage our 2015 capacity growth . . .' Kelly said."

46.     In addition, since merging, the Defendants have ceased using several regional airports as "hubs" for service. For example, United has left hub service at Cleveland Hopkins International Airport, Delta has left hub service at Memphis International Airport, and American has left hub service at Nashville International Airport.

47.     The AP reported on July 15, 2015 that:

> At 40 of the 100 largest U.S. airports, a single airline controls a majority of the market, as measured by the number of seats for sale, up from 34 airports a decade earlier. At 93 of the top 100, one or two airlines control a majority of the seats, an increase from 78 airports, according to AP's analysis of data from Diio, an airline-schedule tracking service.[2]

---

[2] http://bigstory.ap.org/article/7f964b3e484d4b43b732424dd9df0975/airlines-carve-us-markets-dominated-1-or-2-carriers

48.     The AP reported in the same story that, "Recent deals indicate the big airlines intend to stick to a strategy of dominating one airport and forgoing marginal service elsewhere."  The story highlighted United's recent announcement of its departure from John F. Kennedy International Airport, and its intent to transfer its service there to its hub at Newark Liberty International Airport.  In its place, Delta will move some of its service based out of Newark Liberty to its hub at Kennedy.

49.     The Defendants have used this form of "hub protection" as a way of protecting their strongest markets from price competition while ceding ground in the markets they are not competitive to the dominant airline in that market (such as Newark and Kennedy).

50.     This strategy to protect their hubs is demonstrated by the fact that one of the few markets in which two airlines are aggressively competing is at Seattle-Tacoma International Airport, where Delta is challenging a non-Defendant regional airline, Alaska Airlines, for supremacy.

**C.     U.S. Senators Call for Federal Investigation into Airline Industry**

51.     In December 2014, U.S. Senator Charles Schumer from New York called for a federal investigation of U.S. airfares amid falling gas prices.

52.     In a statement, Senator Schumer said, "At a time when the cost of fuel is plummeting and profits are rising, it is curious and confounding that ticket prices are sky-high and defying economic gravity.  So I'm urging the feds to step in and do a price investigation on behalf of consumers who must buy holiday travel tickets that can break the bank."

53.     Senator Schumer added that airlines have previously used increases in gas prices to justify increases in airfare.  He continued, "The industry often raises prices in a flash when oil prices spike, yet they appear not to be adjusting for the historic decline in the cost of fuel; ticket prices should not shoot up like a rocket and come down like a feather.  That is why I urge the DOJ

and DOT to immediately investigate why airline profits are not more efficiently being passed down to consumers."

54.     On June 17, 2015, following the IATA meeting, Senator Richard Blumenthal of Connecticut sent a letter to the DOJ asking it to investigate anticompetitive conduct in the airline industry.  He remarked that "most airlines have traditionally viewed capacity reductions as a highly valuable way to artificially raise fares and boost profit margins.   In light of the recent unprecedented level of consolidation in the airline industry, this public display of strategic coordination [at the IATA meeting] is highly troubling."

55.     In his letter, Senator Blumenthal cited the DOJ's August 2013 lawsuit that sought to block the proposed merger between US Airways and American Airlines.  He pointed to the "stark picture" painted by the DOJ's complaint of an extremely consolidated market; evidence of past behavior by US Airways in punishing rivals for reducing fares; reduced capacity across the industry; and increased coordination among the remaining major airlines in the United States.

56.     Senator Blumenthal closed his letter by urging the DOJ to "conduct a full and thorough investigation of anticompetitive, anti-consumer conduct and misuse of market power in the airline industry, evidenced by recent pricing patterns as well as remarks made at the IATA conference."

## D.     DOJ Requests Information from Defendants About Capacity

57.     It appears the DOJ has taken the Senators' words to heart, and is now investigating whether Defendants colluded to restrain capacity and drive up fares.  On July 1, 2015, Defendants confirmed that the DOJ had requested information from them about capacity and other things.

58.     Specifically, according to the Associated Press, the DOJ sent a Civil Investigative Demand ("CID") to each of the Defendants, seeking documents and information related to the following:

        a.     Tell us who in your company sets the communications strategy to shareholders, investors or analysts and who does that communication.

b.      Give us any documents "discuss[ing] (a) the need for, or the desirability of, capacity reductions or growth limitations by the company or any other airline; or (b) the undesirability of your company or any other airline increasing capacity."

c.      Give us any of your documents that talk about changes in your capacity or that of your competitors.

d.      Give us any communications between you and outside parties about your capacity or that of your competitors and how capacity changes affect fares, revenues or profits.

e.      Tell us the time and place of any conference, meeting or appointment, including telephone calls, you have involving industry analysts (we want your appointment books, day planners, calendars, etc., as well as any materials preparing for such contacts).

f.      Tell us the time and place of any conference, meeting or appointment, including telephone calls, you have had involving other airlines in which capacity was discussed (we want your appointment books, day planners, calendars, etc., as well as any materials preparing for such contacts).

g.      We want to know everybody who owns at least 2 percent of your company, including the time that person owned that much of your company.

h.      Concerning those people who owned at least 2 percent, tell us about all your meetings, appointments or conferences with those people in which industry capacity was discussed. We want to see any calendars, appointment books, day planners, etc., that were involved, as well as any documents prepared for those discussions and which talked about those discussions afterward.

i.      We want to know how much capacity you flew, in available seat miles, every month since January 2010, and please include the seat miles flown by your regional partners as well.

j.      Spell out your document retention policy including emails.

k.      Tell us who is preparing this information and submitting it to us. If someone gives that preparer some oral instructions, tell us who gave the oral instructions and what he and she said.

59.      According to the DOJ's Antitrust Division Manual, last updated in April 2015, before a CID is issued, a section or field office must be authorized to conduct a preliminary investigation into a potential antitrust violation.  In order to obtain authorization for a preliminary investigation, several factors are considered, the first one being "whether there is reason to believe that an antitrust violation may have been committed."  Ch. III § B(1).  Furthermore, "[i]n a civil matter, from the outset, attention should be given to the legal theory, relevant economic learning, the strength of likely defenses, any policy implications, the potential doctrinal significance of the matter, and the availability of an effective and administrable remedy.  *The greater the potential significance of the matter, the more likely the request to open an investigation will be approved*." *Id.* (emphasis added).


## V. <u>TRADE AND COMMERCE</u>

60.      During the Class Period, each Defendant, or one or more of its subsidiaries, sold tickets for domestic air travel in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

61.      During the Class Period, Defendants collectively controlled a vast majority of the market for domestic air travel in the United States.

62.      The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

63.      To the extent Defendants' conduct alleged herein occurred outside the United States, such conduct involved import trade or import commerce, was directed at customers in the

United States, and had a direct, substantial, and reasonably foreseeable effect on import trade or import commerce.

## VI.  CLASS ACTION ALLEGATIONS

64.     Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), on behalf of the following Class:

> All persons and entities who purchased domestic air travel in the United States directly from one or more Defendants between July 1, 2011 and the present. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

65.     Plaintiffs do not know the exact number of Class Members because such information is in the exclusive control of Defendants.  Plaintiffs believe that due to the nature of the trade and commerce involved, there are most likely millions of class members geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

66.     The identities of Class members can be readily determined from records maintained by the Defendants.

67.     Plaintiffs are members of the Class.  Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs are direct purchasers of domestic air travel in the United States.  Plaintiffs and all Class Members were damaged by the same wrongful conduct of Defendants and their co-conspirators as alleged herein, and the relief sought is common to the Class.

68.     Numerous questions of law or fact common to the Class arise from Defendants' anticompetitive behavior, including but not limited to:

> a.     whether Defendants combined or conspired to fix, raise, maintain, or stabilize the price of domestic airfare in the United States;

b.      whether Defendants conspired to restrict the supply of seats sold on domestic flights in the United States; whether Defendants conspired to restrain competition on key airline routes and at each other's "hub" facilities;

c.      whether Defendants shared non-public information, allocated markets and customers, restricted the supply of seats sold on domestic flights in the United States, and committed other conduct in furtherance of the alleged conspiracy;

d.      whether Defendants' conduct caused the prices of domestic airfare in the United States to be at artificially high and noncompetitive levels;

e.      whether Plaintiffs and the other members of the Class were injured by Defendants' conduct, and, if so, the appropriate classwide measure of damages for Class Members;

f.      and whether Plaintiffs and the other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such injunctive relief.

69.      These and other questions of law and fact are common to the Class, and predominate over any questions affecting only individual Class Members, including legal and factual issues relating to liability and damages.

70.      Plaintiffs will fairly and adequately represent the interests of the Class in that Plaintiffs are direct purchasers of one or more domestic flight(s) and have no conflict with any other members of the Class.  Furthermore, Plaintiffs have retained competent counsel experienced in antitrust, class action, and other complex litigation.

71.      Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

72.      This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, effectively,

and without the duplication of effort and expense that numerous individual actions would engender. Prosecution as a class action will eliminate the possibility of repetitive litigation. Class treatment will also permit the adjudication of relatively small claims by class members who otherwise could not afford to litigate an antitrust claim such as that asserted herein. There will be no material difficulty in the management of this action as a class action.

73.     The Class is readily definable and is one for which records likely exist in the files of Defendants and their co-conspirators.

74.     The prosecution of separate actions by individual Class Members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VII.  CLAIM FOR VIOLATIONS OF 15 U.S.C. § 1

75.     Beginning at least as early as July 1, 2011 (the exact date being unknown to Plaintiffs) Defendants and their co-conspirators entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

76.     Defendants have conspired to restrict output by limiting passenger capacity on routes and flights throughout the United States.

77.     As a result of Defendants' unlawful conduct, prices for domestic airfare were raised, fixed, maintained and/or stabilized in the United States.

78.     The conspiracy among Defendants consisted of a continuing agreement, understanding and concerted action among Defendants and their co-conspirators.

79.     For purposes of formulating and effectuating their conspiracy, Defendants and their co-conspirators did those things they conspired to do, including:

        a.     participating in meetings and conversations to discuss the prices and passenger capacity of domestic flights and routes in the United States;

      b.      communicating in writing and/or orally to fix prices and manipulate the passenger capacity of domestic flights and routes in the United States;

      c.      restricting competition at each other's "hubs" and on key routes;

      d.      agreeing to manipulate prices and the passenger capacity of domestic flights and routes in the United States sold throughout the world and in the United States, and to allocate customers of such products, in a manner that deprived direct purchasers of free and open competition;

      e.      issuing price announcements and/or price quotations in accordance with the agreements reached; and

      f.      selling seats on domestic flights in the United States at non-competitive prices.

80.      As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Class have been injured in their businesses and property in that they have paid more for domestic airfare than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## VIII. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs request that the Court enter judgment on their behalf and on behalf of the Class herein, adjudging and decreeing that:

A.      This action may proceed as a class action, with Plaintiffs as the designated Class representatives and their counsel as Class Counsel;

B.      Defendants have combined and conspired in a *per se* violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and that Plaintiffs and the members of the Class have been injured in their business and property as a result of Defendants' violations;

C.      Plaintiffs and members of the Class shall recover threefold the damages sustained by them;

D.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf shall be permanently enjoined and restrained from continuing and maintaining the conspiracy or agreement alleged herein;

E.      Plaintiffs and the members of the Class shall be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

F.      Plaintiffs and the members of the Class shall recover their costs of this suit, including reasonable attorneys' fees, expert fees and costs, as provided by law; and

G.      Plaintiffs and the members of the Class shall receive such other or further relief as may be just and proper.

## IX.  JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: July 20, 2015

Respectfully submitted,

Fred Isquith
Thomas Burt
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
270 Madison Avenue, 10th Floor
New York, New York 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653
isquith@whafh.com
burt@whafh.com

Shannon L. Hopkins
NancyA. Kulesa
LEVI&KORSINSKYLLP
733 Summer Street,
Suite 304
Stamford, CT 06901
Tel. 212-363-7500
Fax. 212-363-7171

***Counsel for Plaintiffs*** _____